## CIRCUIT COURT OF FAIRFAX COUNTY

Barbara V. Palmer

v.

Palmer

May 24, 1990

Case No. (Chancery) 112042

By JUDGE ROSEMARIE ANNUNZIATA

This matter comes before the Court on plaintiff's motion for the equitable distribution of the parties' property and her motions for an award of child and spousal support, the allocation of responsibility for the payments of the children's medical bills, and for an award of attorneys' fees.

The parties were married on January 29, 1969, in Barnesville, Maryland, and separated on November 30, 1985. A final decree of divorce on the grounds of adultery was enacted in favor of Mrs. Palmer on December 30, 1989. There were four children born of the marriage, Richard Justin Palmer, born September 21, 1969, and presently attending James Madison University; Megan Cullen Palmer, born May 10, 1974; Amy Nash Palmer born February 12, 1976, and Mary Cullen Palmer, born August 24, 1978. The parties' three daughters are presently residing with their mother in Richmond, Virginia.

The parties met in the spring of 1967 in the District of Columbia, while both were college students. After the marriage, at the wife's urging, the husband re-entered school in pre-medicine in Las Cruces, New Mexico, and Mrs. Palmer transferred her credits to Las Cruces from Maryville College in St. Louis, Missouri. After the parties'

first child was born in 1969, she continued in school but matriculated in fewer courses. She also worked during that period while her husband continued full-time in school.

After Dr. Palmer graduated with an undergraduate degree in science, he was accepted and attended George Washington Medical School. He worked occasionally in a liquor store and was also in the Army Reserves. Mrs. Palmer finally withdrew from college to work full-time at the National Savings Bank in Washington and to care for her family. Mrs. Palmer's salary and inheritance income from her father's estate were used to support the family. Dr. Palmer's parents contributed financially to the family, as well, by paying for most of his tuition expenses and by contributing funds for household expenses. Mrs. Palmer stopped working in 1974 after their second child was born.

In 1971 when the parties arrived in the Washington Metropolitan area, Mrs. Palmer purchased a home at 3414 Quesada Street, N.W., Washington, D.C., with a $10,000.00 distribution from her father's estate. The property was first purchased by Mrs. Palmer's mother and later transferred into Mrs. Palmer's name. Thereafter she transferred the title from herself to herself and her husband. The majority of the mortgage payments were made from her salary, and inherited funds were used to maintain the home. Mrs. Palmer also assumed responsibility for almost all the maintenance of the home, and she handled the family's finances.

After Dr. Palmer graduated from medical school, he entered and completed a four-year residency in anatomy and physical pathology at George Washington University. Following the residency, Dr. Palmer undertook a sub-specialty in hematology at the National Institute of Health, where he received a regular salary. Mrs. Palmer continued managing the home and caring for the children.

At the completion of the residency, the couple had four children. They refinanced the house on Quesada Street and purchased another residence on Oliver Street in the District of Columbia. The house on Quesada Street was leased for a period of sixteen to eighteen months; Mrs. Palmer assumed responsibility for managing the lease. Upon the sale of the Quesada Street property, the proceeds were invested in stock, held jointly and solely, and placed in savings to fund their children's education. The Oliver

Street property was sold, and the profit was rolled-over into the purchase of a home in McLean, Virginia.

In 1981, Dr. Palmer formed a corporation and went into private practice at Arlington Hospital as an employee of another physician, William Dolan. There is no written contract governing his employment status. His beginning salary of $70,000.00 increased to some $124,000.00 in 1989. A five hundred dollar per month raise went into effect in January of 1990.

Mrs. Palmer acted as the secretary for her husband's professional corporation from 1981 until 1986 when the parties separated. She maintained the records, did the payroll and the typing. Her salary was deposited into the household account.

Approximately four years after the husband joined the staff of the Pathology Department of Arlington Hospital, on December 20, 1985, Dr. Palmer left the marital home after Mrs. Palmer confirmed her suspicion that her husband was having an affair with a family friend, Linda Kirby. Mrs. Palmer's efforts to salvage the marriage through counseling were rebuffed, and Dr. Palmer refused to give up the relationship with Ms. Kirby.

On or about June 24, 1988, the marital home of the parties in McLean was sold with a net profit of $154,708.48. This cash profit has been placed into an escrow account by agreement of the parties and is presently managed by counsel.

Because the wife and children were unable to find affordable housing, it was decided that she and the children should move to Richmond, Virginia, after the sale of the marital home. Mrs. Palmer's mother assisted her in the purchase of a home in Richmond, Virginia. The property is presently titled in the name of Mary V. Cullen and Barbara V. Palmer. Mrs. Cullen provided the full deposit with the understanding that when and if her daughter obtains her share of the escrow monies, she will repay her and the property will be transferred to Mrs. Palmer. Mrs. Palmer was required by the mortgage lender to sign all trust notes because her mother is 76 years old and a non-resident of Virginia. Mrs. Cullen does not live with Mrs. Palmer and the children in the Richmond home.

Mrs. Palmer was originally employed with the Prudential Insurance Co. and presently is on the staff of St. Cath-

erine's School where she earns a gross income of $15,600.00 annually. Her plans to continue her education at Virginia Commonwealth University where she had been admitted were abandoned after Dr. Palmer reduced the support payments she was receiving.

During the course of the marriage, Dr. Palmer enjoyed significant academic and professional success. However, he appears to have been only tangentially involved in the lives of his wife and children. The problem was compounded by Dr. Palmer's increasing involvement with gambling and drinking. Dr. Palmer's gambling losses at times were reported to be as high as $30,000.00 to $40,000.00.

By all accounts, Mrs. Palmer was committed to her husband and children and was primarily responsible for providing the social, physical, and emotional structure needed to establish a family unit. While she did not have the earning power to finance all of her husband's education, it is clear that her non-monetary contributions were substantial. Had Dr. Palmer assumed his share of the responsibility to earn an income and to care for the home and the children, bearing in mind the time and energy such duties demand, he would not have had the freedom to pursue his medical studies and career.

Mrs. Palmer claims there are two assets subject to equitable distribution in this case: the proceeds of sale from the marital residence in McLean and her former spouse's medical practice. Dr. Palmer agrees the proceeds of sale from the marital residence are subject to equitable distribution but contends that his medical practice is nothing more than a license to practice medicine which does not constitute property under Virginia law and, thus, is not subject to equitable distribution. In my opinion, the asset in question is a degree and/or license and not a practice.

How property is defined determines whether a professional degree or license is an asset to be included in the marital estate. The specific issue of whether the degree or license is an asset, subject to equitable distribution, has not been addressed in Virginia. *See*, Averman, "Professional Degree as Marital Property in Virginia," 7 G.M.U. L. Rev. 1 (1984).

In addressing the question, it must first be determined whether the legislature intended a professional degree

or license to be "property," and, thus, subject to equitable distribution pursuant to Va. Code § 20-107.3. Neither the legislative history nor the statute itself provides much guidance. But, the legislative references to property in Va. Code § 20-107.3 identifies property having certain qualities not attributable to a professional degree or license. This section of the Code notably omits any reference to "intangible" property and uses the following terms to describe the property referenced: "title" (Section 20-107.36(A)(2)); "bequest," "devise," "descent," "survivorship" or "gift," (§ 20-107.3(A)(1)); "exchange" and "sale" (§ 20-107.3(A)(1)). The statute provides for the division of marital property through "transfer," "purchase" or "sale." As described by one state court which has addressed the issue:

> An educational degree, such as an M.B.A., is simply not encompassed even by the broad views of the concept of "property." It does not have an exchange value or any objective transferable value on an open market. It is personal to the holder. It terminates on death of the holder and is not inheritable. It cannot be assigned, sold, transferred, conveyed, or pledged. An advanced degree is a cumulative product of many years of previous education, combined with diligence and hard work. It may not be acquired by the mere expenditure of money. It is simply an intellectual achievement that may potentially assist in the future acquisition of property. In our view, it has none of the attributes of property in the usual sense of that term. *In re Marriage of Graham*, 574 P.2d 75, 77 (Colo. 1978).

It should also be noted that the value of a professional degree or license lies with the enhanced earning capacity it provides to the holder. To distribute income based on earning capacity is to distribute income the degree holder may never earn, and its valuation may be considered speculative. *Mahoney v. Mahoney*, 453 A.2d 527, 532 (N.J. 1987); *but see*, Kany Williams, "Compensation for Financing a Spouse's Education: The Means of Economic Justice in

Maine," 35 Maine L. Rev. 341 (1983), for a discussion of various valuation approaches that can be applied. Finally, as other courts have noted, the distribution of such assets implicates property acquired after the marriage. *Id.* at 532, citing *In re Marriage of Aufmuth*, 152 Cal. Rptr. 668, 678 (1979). Section 20-107.3 of the Virginia Code requires that the distribution of property upon the dissolution of a marriage be limited to property acquired during the marriage. For all the above-stated reasons, in my view, a professional degree or license does not constitute property under Va. Code § 20-107.3.

While in my view the professional degree or license does not constitute property under Va. Code § 20-107.3, the increased earning capacity of the degree or license holder may be considered under Va. Code § 20-107.1, which deals with maintenance and support. This is an approach frequently adopted by the states which have ruled the degree or license not to be marital property, and it provides for what is characterized as reimbursement alimony to the non-degree, non-license holder. Loeb and McCann, "Dilemma v. Paradox: Valuation of an Advanced Degree Upon Dissolution of a Marriage," 66 Marquette L. R. 495 (1983); Herring, "Dividing a Diploma in a Divorce," 70 A.B.A. Journal 84 (Dec. 1984); *Mahoney v. Mahoney*, 453 A.2d at 533. In *Mahoney*, the Court held that an award of reimbursement alimony is not "conceptually predicated on a property theory at all but rather represents a general notion of law to do equity in this one special situation." *Id.* at 533. While declining to adopt the theory of reimbursement as a general principle in alimony proceedings, the Court noted:

> [E]very joint undertaking has its bounds of fairness. Where a partner to marriage takes the benefits of his spouse's support in obtaining a professional degree or license with the understanding that future benefits will accrue and inure to both of them, and the marriage is then terminated without the supported spouse giving anything in return, an unfairness has occurred that calls for a remedy. *Id.* at 533.

The bases for an award of alimony based on this concept in the present case are as follows:

1. Mrs. Palmer made financial contributions towards her husband's professional education with the expectation that both parties and their children would enjoy future material benefits as a result.

2. Those contributions include her contributions not only toward educational expenses but also toward household expenses and any other contributions used by Dr. Palmer in obtaining his degree and license.

3. In addition to contribution of earnings and other funds, Mrs. Palmer made financial sacrifices in the reduced standard of living she agreed to accept during the years of Dr. Palmer's training. The financial contributions that would have been made to the marriage had Dr. Palmer been gainfully employed and not a student were eschewed in favor of the prospect of greater support in the future.

4. Mrs. Palmer made substantial non-monetary contributions in the form of establishing and caring for the family unit and creating and maintaining the home environment. Once this shared goal was adopted by the Palmers, both had a responsibility for the care and nurturing of the family unit. Mrs. Palmer accepted nearly all the responsibility for this marital goal, freeing Dr. Palmer to concentrate on his academic and professional goals.

5. It is unfair to deny Mrs. Palmer the anticipated benefits of the marital partnership while Dr. Palmer enjoys all the financial and material awards flowing from the professional status he acquired with the support, monetary and non-monetary, of his former spouse.

In tailoring appropriate alimony awards, the legislature has not precluded consideration of contributions made by one spouse to the career of the other in the expectation of receiving future enhanced support and material benefits. The contributions, monetary and non-monetary, of each party to the well-being of the family is to be considered under § 20-107.1. In fashioning a support award, the statute also requires the Court to consider the property interests of the parties, both real and personal, tangible and *intangible*, the *earning capacity* of the parties and their financial resources, *not limited* to income from pension profit sharing or retirement plans, the education and training of the parties, and "such other factors . . .

as are necessary to consider the equities between the parties."

While Va. Code § 20-107.1 is not a vehicle to be used for the restoration of funds expended during a marriage by one spouse for the benefits of the other when the need for support is not established, *Collier v. Collier*, 2 Va. App. 125 (1986), where the nature of the award is one of support and maintenance of a spouse, a lump sum award is appropriate to balance the equities in cases where the benefits of contributing to the professional education of students' spouses are never realized because a divorce ensues shortly after the degree is acquired.

In light of the above analysis, I find the marital home to be the only marital asset which is subject to equitable distribution. The net proceeds of sale from the home total $159,549.00, which should be distributed 65% to Mrs. Palmer to reflect her greater contributions to the acquisition and maintenance of the property and 35% to Dr. Palmer.

After considering all the factors set forth in Va. Code § 20-107.1, including but not limited to the needs of the wife and the husband's ability to pay, a lump sum reflecting reimbursement alimony in the amount of $75,000.00 is awarded to Mrs. Palmer. The lump sum award reflects her monetary contribution to her husband's acquisition of his degree, in the form of earnings and inheritance funds expended on his behalf during the period of his education and training. It also reflects the substantial non-monetary contributions made, as enunciated hereinabove.

Child support is awarded in the amount of $1,840.00 per month. This figure is premised on and reflective of the statutory guidelines for awarding child support and the extraordinary medical and dental expenses being incurred. Spousal support in the amount of $1,000.00 per month is awarded to Mrs. Palmer.

With respect to the question regarding the payment of certain medical bills, I find that Dr. Palmer maintained a medical and dental reimbursement plan for the reimbursement of costs of medical services in excess of insurance coverage of up to $4,000.00 per year. I am of the view that since Dr. Palmer's payment of medical bills is reimbursable by the plan, he should bear the responsibility

for the payments up to $4,000.00, with any costs not covered to be shared by the parties in proportion to their incomes.

An award of attorneys' fees in the amount of $10,000.00 will also be made to Mrs. Palmer.